**Harry G. STRATIGOS d/b/a Dairy Queen, Petitioner**

v.

**DEPARTMENT OF LABOR AND INDUSTRY, OFFICE OF UNEMPLOYMENT COMPENSATION TAX SERVICES, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Sept. 14, 2012.

Decided Nov. 28, 2012.

---

Harry G. Stratigos, pro se.

Arthur Selikoff, Assistant Counsel, Harrisburg, for respondent.

BEFORE: COHN JUBELIRER, Judge, and BROBSON, Judge, and COLINS, Senior Judge.

OPINION BY Judge BROBSON.

Harry G. Stratigos (Mr. Stratigos), d/b/a Dairy Queen, *pro se*, petitions for review of the decision by the Department of Labor and Industry (Department) to affirm the decision of the Office of Unemployment Compensation Tax Services (OUCTS), which denied Mr. Stratigos' request to redetermine—*i.e.*, reduce—his unemployment compensation (UC) contribution rate.[1] For the reasons set forth below, we affirm.

The facts of this case are undisputed. On October 11, 1995, Mr. Stratigos registered a Dunkin' Donuts franchise for Pennsylvania UC taxes. (Amended Reproduced Record (A.R.R.)at 51.) Mr. Stratigos first paid wages as an employer on September 8, 1995. (A.R.R. at 51.) On October 8, 2008, Mr. Stratigos notified the UC Field Accounting Office (FAO) that, on June 13, 2008, he had discontinued operation of his Dunkin' Donuts franchise and ceased paying wages as an employer. (*Id.* at 46.) Also, Mr. Stratigos informed the FAO that he did not transfer all or any part of the Dunkin' Donuts franchise to another Pennsylvania business. (*Id.*)

In September 2008, Mr. Stratigos acquired a Dairy Queen franchise. (*Id.* at 17.) On October 17, 2008, by filing the PA Enterprise Registration Form, Mr. Stratigos registered the Dairy Queen franchise for, *inter alia,* UC taxes and services. (*Id.* at 32–33, 49.) Furthermore, he indicated on the registration form that he was a sole proprietor of the Dairy Queen franchise and that he had not acquired the franchise or any part of it, including any assets, from another business. (*Id.* at 32–34.) He also indicated on the registration form that he first paid wages as an employer on November 7, 2008, and that he did not provide employment prior to the acquisition of the Dairy Queen franchise. (*Id.* at 33.) Finally, because Mr. Stratigos did not identify any predecessors of his Dairy Queen franchise on the registration form, he did not apply for the experience record and reserve account balance (Experience) of any predecessor.[2] (*Id.* at 34–35.) Mr. Stratigos' UC contribution rate for 2009 was .018370. (*Id.* at 18.)

1. The UC contribution rate is used to determine the amount an employer must pay to the Unemployment Compensation Fund pursuant to the Unemployment Compensation Law (Law). Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §§ 751–914.

2. Under Section 301.1 of the Law, added by the Act of December 17, 1959, P.L. 1893, *as amended,* 43 P.S. § 781.1, in order to determine employers' Experience, employers are classified into three groups based on the length and regularity of their contribution payments. Employers' Experience affects their experience rate, or basic rate, which is the aggregate of three factors: (1) reserve ratio; (2) benefit ratio; and (3) state adjustment (statutory formula). 43 P.S. § 781.1.

The reserve account balance represents the sum of the lifetime contributions paid by an employer subtracted by the lifetime benefits charged against the employer's account. Also, the reserve account balance is *not* a tangible asset to the extent that it is maintained solely for purposes of computing the reserve ratio factor. *See* Section 302 of the Law, 43 P.S. § 782.

On December 31, 2009, OUCTS informed Mr. Stratigos that his UC contribution rate for the year 2010 would be .084792—i.e., 8.4792 percent. (Id. at 36.) Mr. Stratigos appealed. (Id. at 41.) In his January 6, 2010, appeal letter, Mr. Stratigos argued that he had relied on the advice of an OUCTS' representative in forgoing the acquisition of his predecessor's Experience.[3] (Id.) Specifically, he argued that the OUCTS' representative advised him that "[he] would [not] incur a substantial increase if [his] Reserve Balance was positive after all of the employees were called back to the new Dunkin['] Donut[s] ownership group."[4] (Id.) He also argued that, because the Dunkin' Donuts franchise renovations caused the temporary layoffs, OUCTS should not take into account the UC benefits that the laid-off employees collected as a result of the temporary layoffs in fiscal year 2009. (Id.) According to Mr. Stratigos, those benefits were an anomaly and, therefore, unlikely to recur. (Id.) On March 11, 2010, OUCTS denied Mr. Stratigos' 2010 contribution rate appeal. (Id.) OUCTS determined:

> The basic reason for the rate assigned to [Mr. Stratigos] is that unemployment compensation benefits collected by former employees, in the amount of $1,579.00 and $26,384.00 were charged to [Mr. Stratigos'] account for the fiscal years 2008 and 2009. Notices of these

charges were forwarded to [him] at the time compensation was paid.

(Id.)

On March 20, 2010, Mr. Stratigos appealed OUCTS' denial to the Department.[5] (Id. at 17–18.) He essentially repeated the arguments contained in his first appeal before the Department. In discussing his reliance on the OUCTS' representative's advice, Mr. Stratigos asserted:

> I was concerned that my rate would increase detrimentally if I kept my old experience and rate. My accountant had advised me and I suggested to the [Department] representative that I transfer [Mr. Fafalios'] rate since it was the lowest, at .018370, like mine. I was advised by this unemployment office employee to continue using my experience rate especially since I had a Reserve Balance of 31,740 as of 6/30/08 as opposed to transferring [Mr. Fafalios'] rate. I was told specifically that since my reserve balance was so high, I would not incur a substantial increase if my Reserve Balance was positive after all of the employees were called back to the new [renovated] Dunkin['] Donut[s]. . . . I relied on one of the employees at the [Department] instead of transferring [Mr. Fafalios'] rate of the [Dairy Queen franchise] that I purchased. This was my desire, but I was told not to.[6]

---

3. In his appeal letter, Mr. Stratigos asserted, for the first time, that another business had acquired the Dunkin' Donuts franchise. (A.R.R. at 41.) Dunkin' Donuts required the new owners of the franchise to remodel the business. (Id.) As a result of the renovations, all employees were laid off until September of 2009. (Id.) It is unclear whether Mr. Stratigos or the new owners suspended the employees for the duration of the renovations. It is also unclear when Mr. Stratigos and the new owners consummated the transfer of the franchise.

4. The conversation between Mr. Stratigos and the OUCTS' representative occurred sometime between October 21 and November 25, 2008. (A.R.R. at 50.)

5. In his appeal to the Department, Mr. Stratigos, for the first time, identified the Heartland Restaurant Group as the purchaser of his Dunkin' Donuts franchise. (A.R.R. at 17–18.) Also, for the first time, he identified Anastasios Fafalios (Mr. Fafalios) as the previous owner of the Dairy Queen franchise. (Id.)

6. OUCTS indicated that it "[had] no record of any contacts with [Mr. Stratigos] or [his] rep-

(*Id.*) Interestingly, the additional evidence Mr. Stratigos submitted to the Department during the appeal indicated that his accountant, Constantine M. Scoumis (Mr. Scoumis), had advised him to acquire Mr. Fafalios' Experience. (*Id.* at 50.) Indeed, Mr. Scoumis even filled out parts of the application form relating to the acquisition of a predecessor's Experience, and he instructed Mr. Stratigos to complete the remainder of the form by obtaining all necessary information from Mr. Fafalios. (*Id.* at 50–51, 58.) Notwithstanding the advice of Mr. Scoumis, Mr. Stratigos relied on the OUCTS' representative's advice that his 2010 experience-based contribution rate would not substantially increase because of his high reserve balance. (Id. at 50–51.)

On March 21, 2012, the Department issued its decision, affirming OUCTS' determination. (*Id.* at 14.) The Department concluded that, although Mr. Stratigos might have discussed his compensation rate with an OUCTS' representative, it was improper for Mr. Stratigos to have relied on the representative's proffered advice on that matter. (*Id.* at 6–7, 13.) The Department found that, despite the representative's advice, "[Mr. Stratigos] was not prevented from applying for [the transfer of Mr. Fafalios' Experience], either implicitly or explicitly." (*Id.* at 13.) Also, the Department found that Mr. Stratigos did not challenge the statutory formula for computing experience-based UC contribu-

tion rates or the three-year averages. (*Id.* at 11–13.) Moreover, it found that the Law contains no provision by which it allows OUCTS to exempt any properly assessed benefit charges from its computation of experience-based compensation rates. (*Id.*) Ultimately, the Department concluded that the 2009 benefit charges and the reserve account balance were properly calculated and appropriately used in the computation of Mr. Stratigos' 2010 experience-based compensation rate. (*Id.*) Mr. Stratigos now petitions this Court for review.

On appeal,[7] Mr. Stratigos propounds two arguments. First, Mr. Stratigos argues that the Department committed an error of law by concluding that an OUCTS' representative's advice on his 2010 compensation rate did not prevent him from applying for Mr. Fafalios' Experience. Second, he appears to argue that the Department erred as a matter of law in refusing to set aside the 2010 contribution rate.

■ The Law provides for two ways in which Mr. Stratigos could have transferred Mr. Fafalios' Experience. Mr. Stratigos could have applied to have Mr. Fafalios' experience transferred to him or, alternatively, Mr. Stratigos could have established a commonality of ownership, control, or management of the Dairy Queen franchise with Mr. Fafalios to transfer the Experience.[8] Under Section 301(d)(1)(A) of the Law, 43 P.S. § 781(d)(1)(A), Mr. Stratigos

---

resentative, regarding the sale of the Dunkin['] Donuts, the acquisition of the [Dairy Queen franchise] or any applicable [UC contribution rates]." (A.R.R. at 61.) Additionally, OUCTS noted that it "[had] no record that the [Dairy Queen franchise] had been an employer paying wages prior to its operation by Mr. Stratigos." (*Id.*)

7. Our standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. 2 Pa.C.S.

§ 704; *see Zotis Enter. v. Dep't of Labor and Indus.*, 160 Pa.Cmwlth. 568, 635 A.2d 698, 700 n. 4 (1993), *appeal denied*, 539 Pa. 662, 651 A.2d 547 (1994).

8. Section 301(d)(1)(A) of the Law provides:

Where an employer, subsequent to the thirtieth day of June, one thousand nine hundred and forty-nine, transfers his or its organization, trade, business or work force, in whole or in part, to a successor-in-interest who continues essentially *the same business activity* of the whole or part transferred,

had until December 31, 2009—the year subsequent to the 2008 Dairy Queen franchise acquisition—to apply for Mr. Fafalios' Experience. The facts of this case establish that Mr. Stratigos neither applied to have Mr. Fafalios' Experience transferred nor established a commonality of ownership, control, or management of the franchise with Mr. Fafalios. Indeed, Mr. Stratigos failed to even indicate on his registration form for the Dairy Queen franchise that he had acquired all or parts of an existing business.

We reject Mr. Stratigos' contention that the OUCTS' representative is to blame for the increase in his 2010 contribution rate. Here, Mr. Stratigos discussed his contribution rate with the representative in 2008. Despite the representative's advice, Mr. Stratigos was aware of Mr. Scoumis' advice—*i.e.*, applying for Mr. Fafalios' Experience.[9] As Mr. Stratigos admits, Mr. Scoumis' and the OUCTS' representative's advice seemingly impacted his 2010 contri-

bution rate for the Dairy Queen franchise. To determine which competing advice to follow, Mr. Stratigos should have questioned their respective effect on his contribution rate, or broadly put, on his business. In the instant case, Mr. Stratigos chose to rely on the OUCTS' representative's 2008 advice and dismiss Mr. Scoumis' advice. The evidence indicates that Mr. Stratigos failed to examine fully the impact of either advice on his business. In fact, Mr. Stratigos had until December 31, 2009, to apply for Mr. Fafalios' Experience. There is no evidence of record, however, that suggests that Mr. Stratigos had any discussion with Mr. Fafalios about transferring Mr. Fafalios' Experience. Based on the evidence, we conclude that Mr. Stratigos did not act prudently and with due diligence in making an informed business judgment regarding the Dairy Queen franchise's 2010 contribution rate.

■ Next, we address Mr. Stratigos' argument that the Department erred as a

---

such successor-in-interest may, prior to the end of the calendar year *subsequent to the calendar year in which the transfer occurred,* make application for transfer of the whole, or appropriate part, of the experience record and reserve account balance of the preceding employer to the successor-in-interest, including credit for the years during which contributions were paid by the preceding employer. The department shall transfer the whole or appropriate part of such experience record and reserve account balance of the preceding employer only if such preceding employer has joined in such application and has filed with the department such supporting schedules or other information with respect to such experience record and reserve account balance as the department may require....
43 P.S. § 781(d)(1)(A) (emphasis added).
Section 301(d)(1)(B) of the Law provides:
Notwithstanding the provisions of paragraph (A) of this subsection, with respect to any transfer by an employer subject to the contribution provisions of this act of its organization, trade, business or work force, in whole or in part, whether such transfer

was by merger, consolidation, sale or transfer, descent or otherwise, the department shall transfer the experience record and reserve account balance (whether positive or negative) of such employer to its successor-in-interest if it finds that (I) such employer was owned, controlled or managed by or owned, controlled or managed the successor-in-interest either directly or indirectly, by legally enforcible means or otherwise, or (II) both such employer and successor-in-interest were owned, controlled or managed either directly or indirectly, by legally enforcible means or otherwise, by the same interest or interests.
43 P.S. § 781(d)(1)(B).

9. The facts are unclear with regard to what Mr. Fafalios' Experience entails. In particular, we do not know the exact nature of Mr. Fafalios' reserve account balance or his experience-based rate. What we do know, however, is that, according to the OUCTS, when Mr. Fafalios presumably owned the Dairy Queen franchise, the franchise did not pay any wages subject to the Law.

matter of law in refusing to set aside the 2010 contribution rate. In particular, although he does not specifically mention it, Mr. Stratigos appears to argue that the $26,384.00 in benefits that OUCTS charged to his account in the fiscal year 2009 should be exempted from the computation of the reserve ratio and the benefit ratio factors.[10] In other words, he desires a contributions rate of "around two percent or slightly [higher]" for fiscal year 2010. (A.R.R. at 18.) Mr. Stratigos, however, does not cite to any legal authority pursuant to which an exemption of those factors would be justified or permitted. Reading the Law in its entirety, we find no provision that would permit the Department or OUCTS to exempt any benefit charges, regardless of whether they are an anomaly, from the statutory formula used to calculate an experience-based contribution rate. As noted earlier, Mr. Stratigos does not challenge the legality of the statutory formula used to calculate the factors. Also, he does not challenge the accuracy of OUCTS' computation of his 2010 compensation rate. Mr. Stratigos merely hopes to have a different contribution rate apply to his Dairy Queen franchise than that which OUCTS statutorily calculated. To the extent Mr. Stratigos argues potential future stability in his employment force to justify the exemption of the factors, his argument is unavailing. The statutory formula does not take into account events that have not yet occurred. The statutory formula is reactive, inasmuch as it only uses events that already have occurred. We, therefore, conclude that the Department did not err in refusing to deviate from the statutory formula when calculating Mr. Stratigos' experience-based contribution rate for the fiscal year 2010.

Accordingly, we affirm the Department's order.

## ORDER

AND NOW, this 28th day of November, 2012, the order of the Department of Labor and Industry is hereby AFFIRMED.

---

10. Under the Law, an employer can only appeal the reserve ratio and benefit ratio factors of the experience-based contribution rate. *See* Section 301(e)(2) of the Law, 43 P.S. § 781(e)(2). Given that Mr. Stratigos is undisputedly classified in group three based on the length and regularity of his contribution payments, his reserve ratio is determined by his reserve account balance divided by his average annual taxable income for last three fiscal years. *See* Section 301.1(c), 43 P.S. § 781.1(c). Mr. Stratigos' benefit ratio is determined by dividing the average annual benefits charged to his account over the last three years by his annual taxable income for that same time period. *See* Section 301.1(d), 43 P.S. § 781.1(d).

We note that Mr. Stratigos does not offer any substitute that the Department or OUCTS could use in the formula in the event they were to exempt the 2009 benefit charges in the amount of $26,384.00.